**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JOHN DOES 162, 174, 176, 182, 183, and 195, and JANE DOE 1 | |
| Plaintiffs, | Case No.    2:23-cv-2991 |
| v. | |
| THE OHIO STATE UNIVERSITY, | JURY TRIAL DEMANDED |
| Defendant. | |

## **COMPLAINT**

Plaintiffs John Does 162, 174, 176, 182, 183 and 195 and Jane Doe 1 (collectively, the "Plaintiffs") file this Complaint against Defendant, The Ohio State University ("OSU" or the "University") pursuant to this Court's Order dated August 28, 2023 that all law firms that represent Plaintiffs with claims pending against OSU arising out of sexual abuse file a unified Complaint with all such Plaintiffs they represent. *See* Case Number 2:21-cv-02527-MHW-EPD, Doc. #36.

Plaintiffs herein utilize the same anonymous John Doe or Jane Doe designation utilized in the lawsuit in which such Plaintiff originally filed suit. Plaintiffs preserve the date of filing from such original lawsuits into the present lawsuit, and re-state the original filings here as follows, all previously filed in this Court:

1) **Plaintiff John Doe 162**: *John Does 151 - 166 v. The Ohio State University*, Case No. 2:20-cv-3817

2) **Plaintiffs John Does 174, 176, 182, 183 and Jane Doe 1**: *John Does 172 - 191 v. The Ohio State University*, Case No. 2:21-cv-2121

3) **Plaintiff John Doe 195**: *John Does 192 - 217 v. The Ohio State University*, Case No. 2:21-cv-2527

This is a companion case to previously filed cases, including but not necessarily limited to the following: ***Michael DiSabato and John Does 1-36 v. The Ohio State University*, Case No. 2:19-cv-02237; *John Does 37-66 v. The Ohio State University*, Case No. 03165; *John Does 67-88 v. The Ohio State University, Case No. 04397; John Does 88-94 v. The Ohio State University,* Case No. 04624; *Dave Beaudin, Mathew Barclay and John Does 95-136 v. The Ohio State University,* Case No. 04634; *Derek de Jong and John Does 137-139 v. The Ohio State University,* Case No. 05551, *John Does 140-150 v. The Ohio State University,* Case No. 01188, *John Doe 32 v. The Ohio State University,* Case No. 02008, *John Does 151-166 v. The Ohio State University,* Case No. 03817, *John Does 167-171 v. The Ohio State University,* Case No. 03817. *Alonzo Shavers and Kenneth McHone v. The Ohio State University,* Case No. 02120, *John Does 172-191, Jane Doe 1 v. The Ohio State University,* Case No. 02121, John Does 192-217, *v. The Ohio State University*, Case No. 02527, and John Does 218-223, *v. The Ohio State University*, Case No. 04340.**

Plaintiffs allege that Defendant violated Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, as follows:

JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1334 because Plaintiffs allege claims under federal law, specifically Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

2. Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiffs' claims occurred within this district.

<u>PRELIMINARY STATEMENT</u>

3.     Plaintiffs bring this civil rights lawsuit under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* because OSU had actual notice of and was deliberately indifferent to the fact that Richard Strauss, M.D., an OSU employee, tenured faculty member, and the Associate Director of OSU's sports medicine program, sexually assaulted and abused hundreds of male OSU student-athletes and other male OSU undergraduates throughout his almost twenty-year career with the University.  OSU officials not only had actual notice of Strauss' criminal and unlawful actions, they aided, abetted, and actively concealed Strauss' sexual predation on OSU's students.

4.     As a threshold matter, Plaintiffs admit they consented to receiving medical treatment while student-athletes at OSU or, as with Plaintiff John Does 162 and 195, while visiting as recruits.  Plaintiffs, however, did not consent to Strauss doing or saying anything that was medically unwarranted, inappropriate, or unethical.  For numerous reasons described below, Plaintiffs were not in a position to judge Strauss' clinical practices or to avoid him when seeking medical care.

5.     Strauss abused Plaintiffs during pre-season physicals and when treating them for injuries, either through the OSU Athletics Department or OSU's Sports Medicine Clinic at Student Health Services. He also sexually harassed student-athletes in the locker rooms and showers of Larkins Hall, where many teams were based, including wrestling, gymnastics, and swimming.

6.     On information and belief, OSU assigned Strauss a locker in *every room* used by male athletes for the teams based in Larkins Hall.

7.      Strauss also used his access to students to sexually assault/abuse students that were not part of intercollegiate sports.

8.      OSU designated Strauss as a team physician for many sports. Student-athletes could not avoid him if they wanted medical treatment. OSU funneled Plaintiffs and other student-athletes to Strauss with assembly-line efficiency, whereupon Strauss cornered and sexually assaulted them. He sexually assaulted/abused most of the Plaintiffs more than once, and some wrestlers between 20-50 times.

9.      OSU concealed, intentionally ignored, or disregarded athletes' repeated reports and other widely known information that indicated Strauss was a threat to his male patients. A Graduate Assistant Trainer who overlapped with Strauss only one academic quarter noticed "immediately" that something was "off" with Strauss. "In her view, individuals who overlapped with Strauss for any significant period of time would have had to have their 'ear plugged, eyes shut, and mouth closed not to realize something was off.'" *Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University*, Report of Perkins Coie, LLP, May 15, 2019, p. 104 ("Report"). Officials turned a blind eye to numerous red flags that Strauss was sexually abusing his patients, such as: Strauss insisted upon examining patients without any other staff being present, including students in training; Strauss performed notoriously long and thorough "hernia checks" during team physicals; athletes' openly commented on the fact that Strauss made them drop their pants regardless of their medical needs (e.g., to get a case of cauliflower ear treated); and the fact that Strauss showered with athletes from multiple teams, often took multiple showers a day, and requested (and received) multiple lockers in Larkins Hall.

10.      There were other clear signs of Strauss' predatory behavior. When teams reported for pre-season physicals, Athletics Department personnel set up stations for each station of the

physical. Strauss always chose to man the "hernia check" station. He took an extended amount of time with each athlete patient and examined each patient in a room with the door closed. Strauss' "hernia checks" frequently took several minutes. Some lasted as long as ten or fifteen minutes. A line would form outside of Strauss' exam room as the athletes completed the other stations for their physicals and anxiously waited for Strauss to exam them. Strauss' prolonged genital exams were well-known to the athletes he examined, Athletics Department personnel, and team coaches. At least one team head coach requested that someone other than Strauss conduct the hernia checks for team physicals because his athletes complained so much about Strauss' methods.

11. Strauss disguised his sexual assaults in the context of medical examinations. He frequently positioned Plaintiffs so that his face was at the same height as their crotches. Strauss placed his face so close to his patients that they could feel his breath on their genitals. Other times he had them sit on a bench and spread their legs; he would then roll across the floor on a wheeled stool and stick his face deep between their legs to perform his exam. Sometimes Strauss donned a headlamp and turned off the room lights before putting his head inches away from patients' penises. When Plaintiffs asked Strauss why such in-depth and lengthy genital inspections were necessary, or why he was massaging their genitals, probing their rectums, or doing or saying other harassing and inappropriate things, Strauss came up with many different medical explanations. Hernia and lymph node checks were a common explanation. When one Plaintiff asked Strauss to explain the room lights off/headlamp behavior, Strauss said he was checking for skin rashes and STDs. He assured the Plaintiff that this technique allowed him to perform the best possible examination for those kinds of problems.

12.     Strauss also sexually assaulted students by performing anal and rectal exams that were rigorous, lengthy, and medically unnecessary. Although less common than genital exams, they occurred frequently. They were profoundly embarrassing and humiliating to the Plaintiffs who endured them. Numerous Plaintiffs were assaulted in this manner.

13.     Some of the Plaintiffs and other student-athletes reported Strauss' examination methods to team trainers – particularly football trainer Billy Hill. While precise responses differed, the gist was almost always the same: it was not a big deal; Strauss did things his way; Strauss was just being thorough; and/or this had gone on for years.  Other benign explanations were offered. Some Plaintiffs came to believe that Strauss' examinations were a  necessary part of their participation in intercollegiate athletics that was like a "hazing."

14.     In April 2018, OSU authorized the law firm of Perkins Coie, LLP to investigate whether Strauss had sexually abused student-athletes, and if so, the extent to which OSU knew about Strauss' conduct. Perkins Coie, LLP conducted its investigation and issued the Report on May 15, 2019.  Plaintiffs were not aware and had no reason to know of the sexual assaults and abuse conduct by Dr. Strauss and the widespread institutional knowledge giving rise to their causes of action until the report was publicly published. The Report substantiates many of the allegations made by Plaintiffs in this case and in other Title IX cases presently pending before this Court.[1] *See, e.g., Brian Garrett et. al. v. The Ohio State University*, Case No. 2:18-cv-00692-MHW-EPD (S.D. Ohio); *Steve Snyder-Hill et. al. v. The Ohio State University*, Case No. 2:18-cv-00735-MHW-EPD.  Plaintiffs further note the *Garrett, supra* case is a class action complaint first filed on July 16, 2018, and subsequently filed as a consolidated class action complaint on

---

[1] Materials received from Ohio's Medical Board Contents are redacted from the current version of the Report.

May 27, 2020, alleging facts and seeking damages similar, and substantively identical, to those sought by Plaintiffs in this case.

15.    John Does have filed anonymously in this action due to the highly personal nature of the circumstances giving rise to their claims.

16.    Plaintiffs take no pleasure in bringing this lawsuit. OSU is an esteemed institution of higher learning, and a majority of the Plaintiffs love OSU dearly and remain devoted members of The Buckeye Nation.

17.    Plaintiffs were honored to represent OSU in competitive sports and did their best to continue the University's tradition of excellence.

18.    Plaintiffs attended OSU expecting the University would consistently provide them with a safe and supportive environment that would help them perform at their best, both athletically and academically.

19.    Plaintiffs believed that OSU would make patient/athlete safety one of the University's primary concerns.

20.    Team physicians hold a special relationship of trust and confidence with the student-athletes they treat.

21.    Plaintiffs trusted OSU to act in their best interests when selecting, training, and supervising the team physicians on its faculty, regardless of whether their patients are actively enrolled at OSU at the time of treatment.

22.    Plaintiffs trusted OSU to hire physician faculty members who would respect and honor the relationship of trust and confidence that must be present between patients and their physicians.

23. Plaintiffs trusted OSU to regularly and competently evaluate the quality and integrity of the medical services Strauss provided to Plaintiffs.

24. Plaintiffs trusted OSU to investigate faithfully all circumstances that indicated a team physician was unfit to treat Plaintiffs, whether due to acts of sexual assault/abuse or incompetence.

25. Plaintiffs trusted that OSU personnel would not hide, fail to disclose, or disregard known circumstances that raised a substantial likelihood the Plaintiffs or other student-athletes were being sexually assaulted, abused, or harassed by Strauss and/or by conditions at Larkins Hall.

26. Plaintiffs expected OSU, an esteemed institution of higher learning, to investigate the truth about Strauss' conduct in a timely and competent manner, regardless of how unfavorable findings might affect the University's reputation or athletics programs.

27. Plaintiffs relied on OSU to confront and stop Strauss' sexual abuse of Plaintiffs and other male OSU students.

28. Plaintiffs relied on OSU to stop the rampant sexual harassment that student-athletes, particularly the wrestling team, had to endure in Larkins Hall between 1978 and 1998.

29. OSU betrayed Plaintiffs' trust and utterly failed to meet the legal and ethical obligations it owed to Plaintiffs and other OSU students. At all times relevant to this Complaint, OSU officials with authority to institute corrective measures actively concealed, failed to disclose, and showed deliberate indifference towards circumstances that indicated Strauss was sexually assaulting and abusing many male OSU athletes he treated.

30. On information and belief, OSU personnel who failed to implement corrective measures despite having actual knowledge of: (a) the risk that Strauss was sexually assaulting

students, and (b) the sexually hostile environment Larkins Hall presented to athletes on the teams housed there included (but were not limited to) Athletic Directors and Assistant Athletic Directors, Head Team Physicians, and team physicians (who were also faculty members).

31.     At all times relevant to this Complaint, OSU maintained a culture of concealment, denial, and unwillingness to investigate sexual abuse and sexual harassment of male athletes at the University.  This culture led to OSU's active concealment of and deliberate indifference towards continuous complaints and reports about Strauss' behavior and the conditions at Larkins Hall. Consequently, Strauss remained hidden in plain sight and continued to abuse Plaintiffs and other patients throughout his career at the University. Plaintiffs on teams housed in Larkins Hall continued to be harassed on a daily basis. Both of these threats to student safety remained unabated for approximately twenty years.

32.     Only within the two years before filing their respective original Complaints have Plaintiffs realized that Strauss' conduct constituted sexual assault or sexual abuse.

33.     Only within the two years before filing their respective original Complaints have Plaintiffs had a reasonable basis for believing that OSU had actual knowledge of the risk Strauss presented to the student-athletes he treated.

34.     Only within the two years before filing their respective original Complaints have Plaintiffs had a reasonable basis for believing OSU intentionally concealed or showed deliberate indifference to the threat Strauss posed to them.

35.     Only within the two years before filing their respective original Complaints have the Plaintiffs had reason to know that OSU administrators in a position to take corrective measures knew about sexually harassing environment that students and male athletes endured each day in Larkins Hall.

36.     Even if Plaintiffs had realized more than two years before filing their respective original Complaints that Strauss' conduct constituted sexual assault and sexual abuse, Plaintiffs would have had no reasonable basis for alleging or concluding that OSU harmed them separately and independently from the harm that Strauss inflicted on them.  Strauss harmed Plaintiffs by sexually assaulting and abusing them.  OSU separately and independently harmed Plaintiffs by failing to protect them from Strauss despite knowing Strauss was substantially likely to be a sexual predator.  Not until within the two years before filing their respective original Complaints would Plaintiffs' due diligence have allowed them to reasonably infer: (a) what OSU knew about Strauss while Strauss was on the faculty; or (b) what OSU did or failed to do with that information.

37.     Likewise, not until within the two years before filing their respective original Complaints would the Plaintiffs whose teams practiced in Larkins Hall have known: (a) the extent of OSU's institutional knowledge about the conditions in Larkins Hall; or (b) what OSU did or failed to do with that information.

College Recruiting

38.     As noted elsewhere in this Complaint, John Does 162 and 195 were high school aged college recruits when Strauss sexually assaulted them.

39.     OSU had a large incentive to recruit them as student athletes.

40.     College athletics is, simply put, big business, and is a huge source of revenue for the University.

41.     There is perhaps no larger business in the world of collegiate athletics than The Ohio State University, whose athletic department spent more in fiscal year 2019 (July 1, 2019 to June 30, 2020) than any other in the entire United States and was only one of two universities to

spend more than $200 million during that fiscal year. *See* https://www.dispatch.com/story/special/2020/07/16/ohio-state-athletic-department-led-nation-in-spending-in-2019-fiscal-year/41706003/ (last accessed, June 8, 2021).

42.     The Ohio State Department of Athletics (the "Athletic Department") brought in $233,871,740 in fiscal year 2020—despite the pandemic. *See* https://news.osu.edu/ohio-state-athletics-notches-record-revenue-spends-less-than-last-year/ (last visited June 8, 2021); and FY2020 NCAA Membership Financial Report for The Ohio State University attached thereto (the "FY2020 Report").

43.     The University and numerous coaches, administrators, and other employees benefit immensely from these unpaid student athletes. As but one example, former OSU head football coach Urban Meyer earned $7.6 million in 2018, making him not only the highest paid employee at OSU but the highest paid public employee in the State of Ohio that year.

44.     From the revenue just cited, the following compensation and bonuses were paid to University employees in 2020:

| | |
|---|---|
| Coaching Salaries, Benefits and Bonuses paid by the University and Related Entities | $36,296,140.00 |
| Support Staff/Administrative Compensation, Benefits and Bonuses paid by the University and Related Entities | $40,726,739.00 |
| Coaching compensation/bonuses for the Football Team | $1,792,750.00 |

*See*, FY2020 Report

45. In Fiscal Year 2020, OSU spent $2,015,358 on recruiting; and again, this was during a pandemic. *Id.*

46. "Recruiting is the lifeblood of this program," as OSU Athletic Director Gene Smith has said on numerous occasions, including during a 2017 press conference announcing the end of Thad Matta's tenure as the University's head men's basketball coach. *See* https://www.elevenwarriors.com/ohio-state-basketball/2017/06/82714/video-thad-matta-and-gene-smiths-press-conference-to-announce-the-end-of-mattas-run-as-ohio-state-mens-basketball (last accessed, September 16, 2023)

47. Universities, including OSU, expend significant time, money, and energy securing top talent for their athletic programs through the recruiting process.

48. The National Collegiate Athletic Association (the "NCAA") explains that recruiting happens when a college employee or representative invites a high school student-athlete to play sports for their college. *See* https://www.ncaa.org/student-athletes/future/recruiting (last accessed, September 16, 2023)

49. During an official recruiting visit, the college can, and does, pay for transportation, lodging, meals, entertainment expenses, and tickets to home sports events for the student-athlete and his or her parents or guardians. *Id.*

50. Often times, however, a university breaks the rules in its zeal to secure the best student athletes and the tremendous sums of money that flow to the university by putting the best talent on the field.

51. For instance, between May 1, 2017 and May 22, 2019, OSU self-reported 22 NCAA violations just for the men's football and basketball teams, including the following violations of NCAA recruiting rules:

Impermissible text messages, impermissible phone calls, impermissible promotion, preferential treatment, an assistant recruited prior to passing recruiting exam, student-athlete reinstatement, impermissible publicity, promotion using student-athlete image, impermissible publicity and inducement, an impermissible tweet, impermissible electronic correspondence, impermissible text messages, use of image/name/likeness, use of outside consultant, Big Ten tender filing deadline missed and financial aid overage.

*See*, https://247sports.com/Article/Ohio-State-Buckeyes-NCAA-violations-recruitin2020-Ryan-Day-football-basketball-133889144/ (last accessed September 16, 2023)

52. More than that, these are impressionable young athletes who predictably come to the university in awe of the facilities, stadiums, coaches, older student-athletes, and the tradition of the beloved university they have been invited to tour.

53. A high school recruit is the most vulnerable of all guests at a university. A high school recruit has no understanding or expectation of what is normal or expected of student-athletes at the university.

54. The university meticulously plans and organizes recruiting visits to form personal relationships with the recruits, to earn the recruits' trust , and to cultivate the recruits' dream of playing for the school.

55. On one side of the recruiting visit in our case is OSU, one of the most prestigious and powerful academic institutions in the United States.

56. On the other side of the recruiting visit is a naïve, impressionable adolescent with athletic skills the University covets for the continued success and glory of its program, coaches, and administrators.

57. A university provides the recruit gifts, the best food, and housing during the visit.

58. A university pairs recruits with a college-aged student athlete, and also co-ed hosts for entertainment and guided tours of the campus and of training facilities that far outshine the recruit's high school experience.

59.     Most profoundly, the university introduces the recruit to the players and coaches who are heroes in a sport the young recruit loves as much as anything else in life.

60.     During the recruiting visits, these same coaches tell the recruits that the university will look out for them, protect them, and make sure they get the best facilities, equipment, and medical/training staff.

61.     During the recruiting visits, these same coaches tell the recruits the university will turn them into leaders and make them better athletes and better human beings.

62.      With an athletic scholarship, the university offers a free education and, at a school like OSU, the chance to be part of one of the most prestigious athletic departments in the entire United States.

<u>THE PARTIES</u>

63.     Defendant The Ohio State University was at all relevant times and continues to be a public university organized and existing under the laws of the State of Ohio.

64.     Defendant OSU receives, and at all relevant times received, federal financial assistance. Defendant is therefore subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. §1681, *et seq.*

65.     Most Plaintiffs were enrolled at OSU as students during Strauss's employment with OSU.

66.     Most Plaintiffs participated in OSU intercollegiate sports teams while enrolled at OSU.

67.     Plaintiffs received financial assistance from OSU. Most financial assistance was linked to their participation on OSU's intercollegiate sports teams.

68.     John Doe 162 is a resident of the State of Ohio.

69.     Plaintiff John Doe 162 was a high school sophomore when the University's head wrestling coach invited Plaintiff John Doe 162 on a recruiting visit to convince Plaintiff John Doe 162 to enroll at OSU and wrestle for the University by having Plaintiff John Doe 162 see the school and athletic facilities and meet with other student-athletes.

70.     It is in the recruiting environment set forth above that OSU invited Plaintiff John Doe 162, an impressionable high school sophomore, and under the age of 18, for what should have been an awe-inspiring and uplifting opportunity to understand the athletic and educational opportunity that awaited him if he accepted OSU's head wrestling coach's offer to apply to and attend the University.

71.     When Plaintiff attended OSU for his recruiting visit, he was honored to be encouraged to become a part of the OSU family when OSU provided, said and did all of the recruiting steps outlined above.  Plaintiff hoped to do his part to continue the University's tradition of excellence.

72.     On his recruiting visit, Plaintiff John Doe 162 toured OSU and met with leaders in the wrestling department, and also Strauss, expecting that the University would provide him with a safe and supportive environment during his visit, and that if he accepted OSU's invitation to attend the school, OSU would help him perform at his best, both athletically and academically.

73.     Plaintiff John Doe 162's older brother was already a star wrestler at OSU and Plaintiff, himself, was a star high school wrestler, so OSU and its head wrestling coach were very interested in Plaintiff accepting OSU's invitation to apply to, attend, and wrestle for OSU.

74.     The head wrestling coach at OSU telephoned John Doe 162 several times to recruit him for OSU.

75.     During the recruiting visit, John Doe 162 met with the head wrestling coach personally, who strongly urged John Doe 162 to apply, enroll, and wrestle for OSU.

76.     During the recruiting visit, OSU provided John Doe 162 gifts including food, housing, and OSU branded clothing. OSU also had Plaintiff watch a wrestling practice, tour the facilities, and meet players and coaches.

77.     OSU told Plaintiff John Doe 162 he could trust and rely upon OSU to provide him with the best facilities, coaching, equipment, and medical/training staff. Plaintiff John Doe 162 attended his recruiting visit reasonably believing that OSU would not subject him to rape or sexual assault by the wrestling team's physician, Strauss.

78.     But unbeknownst to Plaintiff John Doe 162, Ohio State in fact allowed Strauss, a known predator, to be alone with him under the guise of a medical examination where Strauss tragically, and predictably, sexually assaulted and raped Plaintiff with his finger.

79.     At the time of his recruiting visit, John Doe 162 had an elbow injury and his elbow was in a sling. Strauss approached John Doe 162, asked about his elbow. He told John Doe 162 that he was the sports doctor for OSU, and that he would examine Plaintiff's elbow.

80.     Strauss took John Doe 162 into a side room, where he sexually assaulted/abused and digitally raped John Doe 162 under the pretext of performing a medical exam. Strauss told Plaintiff to remove his pants and underwear. He did it in a matter-of-fact, clinical way and explained it away as routine procedure. However, Strauss sexually assaulted/abused John Doe 162 by conducting a long, extensive genital exam where Strauss fondled John Doe 162's genitals and buttocks. At that point, John Doe 162 began feeling very confused and uncomfortable; his genitals were being sexually stimulated. Strauss also inserted his finger into Plaintiff's anus and moved his finger inside Plaintiff for what felt like a prolonged time.

16

81.     Plaintiff froze and felt uncomfortable, but he believed (as Ohio State had just told and shown him before and during the recruiting visit) that Ohio State is the best, that Ohio State is beyond reproach, that Ohio State does everything right, so that must just be the way proper student athlete doctor examinations are done.

82.     When Plaintiff attended OSU for his recruiting visit, he had no understanding of what to expect when OSU placed him in the care of a team doctor—except the knowledge that a team doctor could tell the school he is not physically able to play his beloved sport on a full ride scholarship, so he better just do what the doctor tells him.

83.     Plaintiff took it on faith that Strauss meant what he said and was performing a very thorough examination. Plaintiff had no education, training, or experience that provided him a basis for questioning Strauss's examination methods or treatment protocols.

84.     Ohio State's actions and its deliberate indifference denied Plaintiff John Doe 162 the benefits of any education program, or activity including, but not limited to, the recruiting trip and the benefit of applying to and attending The Ohio State University.

85.     Plaintiff John Doe 174 is a resident of the State of Ohio.

86.     Plaintiff John Doe 174 attended OSU from 1980-1984 and again from 2007-2009. He was a member of the football team for 4 years while he attended OSU in the 1980s.

87.     Strauss treated John Doe 174 approximately 1 time while John Doe 174 was a student athlete on the football team at OSU. Strauss sexually assaulted/abused John Doe 174 1 time. Strauss sexually assaulted/abused John Doe 174 by performing a rectal exam where he digitally penetrated John Doe 174 under the guise of a prostate exam. Strauss also conducted a long genital exam where Strauss massaged his groin and worked his hands up to his crotch where he excessively fondled and moved his hands around John Doe 174's penis and testicles. Both

acts were done in a manner that made John Doe 174 feel very uncomfortable. The exam involved Strauss trying to arouse John Doe 174.

88.    John Doe 174 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 174 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 174. And John Doe 174 was raised to believe that doctors help their patients, not hurt them.

89.    Before May 15, 2019, John Doe 174 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 174 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 174 on notice that Strauss was a sexual predator.

90.    Before May 15, 2019, John Doe 174 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

91.    After May 15, 2019, John Doe 174 learned that Strauss' examination in which Strauss manipulated John Doe 174's genitals and digitally penetrated him was medically unwarranted, improper, and even criminal. John Doe 174 also learned that Strauss was a serial sexual offender. Then John Doe 174 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

92.    OSU showed more than deliberate indifference by placing John Doe 174 under Strauss' care. OSU betrayed John Doe 174 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never

would have exposed John Doe 174 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

93.     Further, before contacting and retaining his attorney in December 2020, John Doe 174 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 174 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 174 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 174 on notice that Strauss was a sexual predator.

94.     Before contacting and retaining his attorney in December 2020, John Doe 174 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In December of 2020, when he contacted and retained his attorney, John Doe 174 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 174 also learned that Strauss was a serial sexual offender. Then John Doe 174 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 174 and assaulted many other Ohio State students.

95.     Plaintiff John Doe 176 is a resident of the State of Florida.

96.     Plaintiff John Doe 176 attended OSU from 1980-1986 and was a member of the football team for 4 years while he attended OSU.

97.     Strauss treated John Doe 176 approximately 3 times while John Doe 176 was a student athlete on the football team at OSU. Of those 3 times, Strauss sexually assaulted/abused

John Doe 176 2 times. Strauss sexually assaulted/abused John Doe 176 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 176's genitals in a manner that made John Doe 176 feel very uncomfortable.

98.     John Doe 176 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 176.

99.     John Doe 176 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 176 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 176. And John Doe 176 was raised to believe that doctors help their patients, not hurt them.

100.    Before May 15, 2019, John Doe 176 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 176 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 176 on notice that Strauss was a sexual predator.

101.    Before May 15, 2019, John Doe 176 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

102.    After May 15, 2019, John Doe 176 learned that Strauss' examinations in which Strauss manipulated John Doe 176's genitals were medically unwarranted, improper, and even criminal. John Doe 176 also learned that Strauss was a serial sexual offender. Then John Doe 176 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

103.     OSU showed more than deliberate indifference by placing John Doe 176 under Strauss' care. OSU betrayed John Doe 176 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 176 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

104.     Further, before contacting and retaining his attorney in December 2020, John Doe 176 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations. John Doe 176 was not aware of prior, credible allegations that Strauss had sexually assaulted other students. No action taken by Strauss put John Doe 176 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 176 on notice that Strauss was a sexual predator.

105.     Before contacting and retaining his attorney in December 2020, John Doe 176 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In December of 2020, when he contacted and retained his attorney, John Doe 176 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 176 also learned that Strauss was a serial sexual offender. Then John Doe 176 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 176 and assaulted many other Ohio State students.

106.     Plaintiff John Doe 182 is a resident of the State of Ohio.

107.    Plaintiff John Doe 182 attended OSU from 1981-1985 and returned to graduate in 2020. John Doe 182 and was a member of the football team for 4 years while he attended OSU in the 1980s.

108.    Strauss treated John Doe 182 approximately 9 times while John Doe 182 was a student athlete on the football team. Of those 9 times, Strauss sexually assaulted/abused John Doe 182 every time. Strauss sexually assaulted/abused John Doe 182 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 182's genitals in a manner that made John Doe 182 feel very uncomfortable.

109.    John Doe 182 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 182. John Doe 182 also remembers Strauss making him strip completely naked for his exams.

110.    John Doe 182 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 182 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 182. And John Doe 182 was raised to believe that doctors help their patients, not hurt them.

111.    Before May 15, 2019, John Doe 182 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 182 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 182 on notice that Strauss was a sexual predator.

112.    Before May 15, 2019, John Doe 182 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

113.    After May 15, 2019, John Doe 182 learned that Strauss' examinations in which Strauss manipulated John Doe 182's genitals were medically unwarranted, improper, and even criminal. John Doe 182 also learned that Strauss was a serial sexual offender. Then John Doe 182 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

114.    OSU showed more than deliberate indifference by placing John Doe 182 under Strauss' care. OSU betrayed John Doe 182 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 182 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

115.    Further, before contacting and retaining his attorney in December 2020, John Doe 182 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 182 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 182 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 182 on notice that Strauss was a sexual predator.

116.    Before contacting and retaining his attorney in December 2020, John Doe 182 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In

December of 2020, when he contacted and retained his attorney, John Doe 182 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 182 also learned that Strauss was a serial sexual offender. Then John Doe 182 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 182 and assaulted many other Ohio State students.

117.    Plaintiff John Doe 183 is a resident of the State of Ohio.

118.    Plaintiff John Doe 183 attended OSU from 1980-1983 and was a member of the football team for 4 years while he attended OSU.

119.    Strauss treated John Doe 183 approximately 8 times while John Doe 183 was a student athlete on the football team at OSU. Of those 8 times, Strauss sexually assaulted/abused John Doe 183 every time. Strauss sexually assaulted/abused John Doe 183 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 183's genitals in a manner that made John Doe 183 feel very uncomfortable.

120.    John Doe 183 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 183.

121.    John Doe 183 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 183 expected that OSU demanded the same excellence from Strauss that they demanded from John Doe 183. And John Doe 183 was raised to believe that doctors help their patients, not hurt them.

122.    Before May 15, 2019, John Doe 183 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 183 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 183 on notice that Strauss was a sexual predator.

123.    Before May 15, 2019, John Doe 183 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

124.    After May 15, 2019, John Doe 183 learned that Strauss' examinations in which Strauss manipulated John Doe 183's genitals were medically unwarranted, improper, and even criminal. John Doe 183 also learned that Strauss was a serial sexual offender. Then John Doe 183 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

125.    OSU showed more than deliberate indifference by placing John Doe 183 under Strauss' care. OSU betrayed John Doe 183 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 183 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

126.    Further, before contacting and retaining his attorney in February 2021, John Doe 183 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 183 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 183 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 183 on notice that Strauss was a sexual predator.

127. Before contacting and retaining his attorney in February 2021, John Doe 183 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In February of 2021, when he contacted and retained his attorney, John Doe 183 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 183 also learned that Strauss was a serial sexual offender. Then John Doe 183 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 183 and assaulted many other Ohio State students.

128. Plaintiff John Doe 195 is a resident of the State of Ohio.

129. In the recruiting environment described above, Plaintiff John Doe 195 attended OSU's campus as a prospective athlete for their swimming team. John Doe 195's high school coach was a former All-American diver for OSU and would bring John Doe 195 to OSU's campus to practice when John Doe 195 was in high school from his freshman year through his senior year, 1978-1981, and OSU invited John Doe 195 to apply to OSU during these visits.

130. Strauss treated John Doe 195 approximately 10 times while John Doe 195 was on campus at OSU between 1978-1981. Of those 10 times, Strauss sexually assaulted/abused John Doe 195 every time. Strauss sexually assaulted/abused John Doe 195 by conducting long genital exams where Strauss would excessively fondle and move his hands around John Doe 195's penis in a stroking manner that made John Doe 195 feel very uncomfortable. Strauss also examined his anus, digitally penetrating him, while continuing to stroke his penis pressing his body up against John Doe 195 until John Doe 195 ejaculated.

131.    John Doe 195 recalls Strauss giving him extended physicals even when he was seeing him for an unrelated sickness or ailments. The exams involved Strauss trying to arouse John Doe 195 and one exam also went as far as Strauss orally raping John Doe 195 and telling John Doe 195 it was for the purpose of determining if John Doe 195's penis was working properly.

132.    John Doe 195 felt uneasy around Strauss in his exams. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. John Doe 195 expected that OSU demanded the same excellence from Strauss that they demanded from anyone on their campus. And John Doe 195 was raised to believe that doctors help their patients, not hurt them.

133.    Before May 15, 2019, John Doe 195 did not know Strauss had sexually assaulted him. In short, nothing Strauss did placed John Doe 195 on notice that Strauss might have been sexually assaulting him. Likewise, OSU did nothing to put John Doe 195 on notice that Strauss was a sexual predator.

134.    Before May 15, 2019, John Doe 195 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

135.    After May 15, 2019, John Doe 195 learned that Strauss' examinations in which Strauss manipulated John Doe 195's genitals, digitally penetrated him, and orally raped him were medically unwarranted, improper, and even criminal. John Doe 195 also learned that Strauss was a serial sexual offender. Then John Doe 195 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many others on OSU's campus.

136.    OSU showed more than deliberate indifference by placing John Doe 195 under Strauss' care. OSU betrayed John Doe 195 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed John Doe 195 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

137.    Further, before contacting and retaining his attorney in May 2021, John Doe 195 did not know Strauss had sexually assaulted him during his purported legitimate medical examinations.  John Doe 195 was not aware of prior, credible allegations that Strauss had sexually assaulted other students.  No action taken by Strauss put John Doe 195 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put John Doe 195 on notice that Strauss was a sexual predator.

138.    Before contacting and retaining his attorney in May 2021, John Doe 195 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In May of 2021, when he contacted and retained his attorney, John Doe 195 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. John Doe 195 also learned that Strauss was a serial sexual offender. Then John Doe 195 learned that Ohio State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted John Doe 195 and assaulted many other Ohio State students.

139.    Ohio State's actions and its deliberate indifference denied Plaintiff John Doe 195 the benefits of any education program, or activity including, but not limited to, the recruiting trip and the benefit of applying to and attending The Ohio State University.

140.    Plaintiff Jane Doe 1 is a resident of the State of Ohio.

141.    Plaintiff Jane Doe 1 attended OSU from 1994-1998.

142.    Strauss treated Jane Doe 1 approximately 1 time while Jane Doe 1 was a student at OSU. Strauss sexually assaulted/abused Jane Doe 1 1 time. Strauss sexually assaulted/abused Jane Doe 1 by conducting long a long breast exam where Strauss excessively fondled and groped Jane Doe 1's breasts in a manner that made Jane Doe 1 feel very uncomfortable.

143.    The exam involved Strauss trying to arouse Jane Doe 1.

144.    Jane Doe 1 felt uneasy around Strauss in his exam. But that was not a basis for questioning Strauss' clinical competence. Plus, OSU had hired and assigned Strauss to be a physician. Jane Doe 1 expected that OSU demanded the same excellence from Strauss that they demanded from Jane Doe 1. And Jane Doe 1 was raised to believe that doctors help their patients, not hurt them.

145.    Before May 15, 2019, Jane Doe 1 did not know Strauss had sexually assaulted her. In short, nothing Strauss did placed Jane Doe 1 on notice that Strauss might have been sexually assaulting her. Likewise, OSU did nothing to put Jane Doe 1 on notice that Strauss was a sexual predator.

146.    Before May 15, 2019, Jane Doe 1 had no reason to suspect that one or more OSU administrators, who could have instituted corrective measures, knew Strauss was a sexual predator. For decades, OSU had kept secret the fact that Strauss was a sexual predator.

147.     After May 15, 2019, Jane Doe 1 learned that Strauss' examination in which Strauss fondled and groped Jane Doe 1's breasts was medically unwarranted, improper, and even criminal. Jane Doe 1 also learned that Strauss was a serial sexual offender. Then Jane Doe 1 learned that OSU *knew* Strauss was sexually assaulting student patients, where Strauss sexually assaulted many other OSU students.

148.     OSU showed more than deliberate indifference by placing Jane Doe 1 under Strauss' care. OSU betrayed Jane Doe 1 in the most extreme possible manner. If OSU had exercised the slightest degree of care for Plaintiffs and other persons Strauss treated, OSU never would have exposed Jane Doe 1 or any other Plaintiff to Strauss or any other physician who had a history of sexually assaulting his patients.

149.     Further, before contacting and retaining her attorney in January 2021, Jane Doe 1 did not know Strauss had sexually assaulted her during his purported legitimate medical examinations. Jane Doe 1 was not aware of prior, credible allegations that Strauss had sexually assaulted other students. No action taken by Strauss put Jane Doe 1 on notice that Strauss might have been sexually assaulting him. Likewise, Ohio State did nothing to put Jane Doe 1 on notice that Strauss was a sexual predator.

150.     Before contacting and retaining her attorney in January 2021, Jane Doe 1 had no reason to suspect that one or more Ohio State administrators, who could have instituted corrective measures, knew Strauss was a sexual predator while acting as team physician. For decades, Ohio State had kept secret what it knew about Strauss's history of sexual predation. In January of 2021, when he contacted and retained her attorney, Jane Doe 1 learned that Strauss conducted medical exams that were medically unwarranted, improper, and even criminal. Jane Doe 1 also learned that Strauss was a serial sexual offender. Then Jane Doe 1 learned that Ohio

State *knew* Strauss was sexually assaulting student patients while he was employed by Ohio State as a physician for Ohio State student-athletes, where Strauss ultimately assaulted Jane Doe 1 and assaulted many other Ohio State students.

STRAUSS

151.    OSU employed Richard Strauss, M.D., as a faculty member from September 1978 until March 1, 1998.

152.    In 1978, Strauss was hired as an Assistant Professor of Medicine in the Pulmonary Disease Division of the Department of Medicine.

153.    By 1980, Strauss was Associate Director of the Sports Medicine Program.  In 1981, Strauss began an appointment in the Athletics Department and expanded his clinical duties to the Sports Medicine Clinic at University Health Services.  By 1982, Strauss' primary affiliation was with the Department of Preventive Medicine.

154.    OSU granted Strauss tenure as an associate professor in 1983. OSU made Strauss a full professor with tenure in 1992.  Strauss voluntarily retired in March 1998 and was approved by the Board of Trustees for emeritus status in the School of Public Health. Emeritus status was granted without the review or approval of the Dean of the College of Medicine and Public Health. (Report, p. 31,32.)

155.    Throughout his employment, Strauss provided medical services to various OSU sports teams.  Strauss initially served as a team physician for the wrestling, swimming, and gymnastics teams, which were based at Larkins Hall.  At that time, Larkins Hall was OSU's physical education building and aquatics facility.

156.    "Over the years, Strauss' responsibilities as a team physician expanded beyond just the teams based out of Larkins, and included assignments with teams and in facilities across

campus[,]" (Report at 2.) Around 1980, Strauss began treating patients at the Sports Medicine Clinic at Student Health Services. He was ultimately appointed Chief Physician of the Sports Medicine Clinic.  As time went on, Strauss treated students "who participated in a wide range of sports including hockey, cheerleading, volleyball, soccer, track, golf, baseball, tennis, water polo, and football." (*Id.* at 34).

157.    Strauss' appointment with Student Health ended in 1996 following an investigation into student complaints about Strauss' sexual misconduct during medical exams.

STRAUSS' ACTS OF SEXUAL ASSAULT AND ABUSE

158.    Strauss used his position of trust and confidence to regularly and systematically sexually assault, abuse, batter, molest, and harass students, student-athletes, non-students as young as 14 invited onto the campus, non-students on OSU sponsored trips off-campus to high schools throughout Ohio, and others over the course of his career in his capacity as an employee, agent, and/or representative of OSU.

159.    Without OSU's imprimatur, Strauss would not have had access to the OSU students and others upon whom he preyed.

160.    Strauss abused Plaintiffs and OSU students in one or more of the following ways (as categorized by the Report):

　　a.  In the context of a medical examination that caused the student to reach ejaculation or nearly reach ejaculation;

　　b.  In the context of a medical examination that caused the student to reach erection or nearly reach erection;

　　c.  Unnecessary fondling or groping of genitals in the context of a medical examination, or medically unnecessary examinations of the genitals or rectum.

      d.   Examination techniques that included: unnecessary nudity; excessive touching of non-genital/non-rectal areas of the student's body; inappropriate verbal commentary or sexually charged questioning; lack of medical gloves for genital examinations; unnecessarily invasive physical positions; medical treatment outside a clinical setting; and *quid pro quo* arrangements; and

      e.   Inappropriate and sexually abusive conduct outside of the examination room, including showering alongside student-patients, loitering in student-athletes' locker rooms and engaging in voyeuristic behavior, and initiating fraternization with patients. (Report at 39)

161.    Ohio Revised Code 2907.02 defines rape, in relevant part, as "engag[ing] in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

162.    In turn, Ohio Revised Code 2907.01 defines "sexual conduct" in relevant part as the insertion of any part of the body into the anus of another.

163.    Strauss inserted his finger into the anus of countless young men.

164.    Strauss longingly moved his finger in and all around their anuses for his own sexual pleasure.

165.    Strauss had no legitimate medical reason to do this to young men even if it was not for Strauss' sexual gratification.

166.    Ohio Revised Code 2901.01 defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."

167.    At other times, Strauss put his penis inside young men when they were under medication.

168. Strauss used his authority and the positioning of these young men when OSU left them alone in his examination room to force them to endure digital anal rape.

169. Strauss raped these young men.

170. Strauss raped their lives.

171. Strauss committed these acts of sexual abuse and harassment consistently and on a daily basis throughout his career at OSU.

172. With their collegiate athletic careers and scholarships on the line, many athletes sought treatment from Dr. Strauss for a required physical or for treatment of other physical conditions, at a high cost to their mental and emotional health.

173. Strauss committed these acts of sexual abuse while an OSU faculty member.

WHY PLAINTIFFS HAD DIFFICULTY REALIZING OR REPORTING STRAUSS'S CONDUCT AS SEXUALLY ABUSIVE

174. Plaintiffs were vulnerable to Strauss' sexual abuse, and many were not able to identify Strauss' conduct as sexual abuse when it occurred. Many factors caused this result, as set forth below.

175. Plaintiffs were treated by Strauss in his capacity as a Team Physician through the Athletics Department or at the Sports Medicine Clinic. He was the person officially designated to treat them.

176. Plaintiffs had to pass a pre-season physical in order to participate in their sport.

177. Before attending OSU, some Plaintiffs had not seen a doctor without their parents being present.

178. Plaintiffs tended to attribute Strauss' surprisingly "rigorous" genital and rectal examinations to the fact that the physical requirements of intercollegiate sports were much greater than for high school competition.

179.    Plaintiffs were sexually assaulted/abused by Strauss in the context of a purported medical examination, such as when seeing him for a pre-season physical or for a sports-related injury.  They came into contact with him under legitimate circumstances and were more likely to interpret what took place in the examination room within that framework of legitimacy.

180.    When Strauss abused Plaintiffs, male sexual abuse was not a commonly acknowledged problem or a commonly discussed topic among non-educators or people outside the fields of medicine and counseling.

181.    Plaintiffs were brought up to believe that doctors are trustworthy and do not intentionally hurt their patients.

182.    Plaintiffs were brought up to believe that a "good" patient is a compliant patient.

183.    Plaintiffs treated by Strauss were placed in a vulnerable position, both physically and emotionally, when Strauss examined them. They were not psychologically predisposed to question Strauss' clinical practices.

184.    There was a huge disparity between Strauss' medical knowledge and the Plaintiffs.  They had no standing to challenge his explanations for the things he did to them.

185.    Plaintiffs were on Strauss' "turf" when he examined them in his office with the door closed.  Strauss' psychological and educational advantage over each athlete in the examination room was just as great as the athlete's physical advantage over Strauss would have been if they had competed against each other in the athlete's chosen sport.

186.    Plaintiffs went into exams, particularly pre-season physicals, expecting their doctors to touch them.  They knew that doctors often have to touch their patients as part of their work.  Plaintiffs had neither the experience nor education to know the limits of appropriate physical contact during medical examinations.

187.    Plaintiffs attended OSU believing its doctors and medical faculty would inform patients about the medical services they provided to them to the extent they were legally or ethically required to do so.

188.    Plaintiffs entered Strauss' examination rooms presuming that what occurred in a doctor's office was supposed to be confidential. Even under the most normal circumstances, Plaintiffs wanted their genital or rectal examinations to remain confidential because such topics were embarrassing to discuss. When Strauss' examinations became overly aggressive or lingered too long in intimate areas, it made more sense for Plaintiffs to chalk a feeling that something was wrong up to them feeling unwarranted embarrassment or shame. The alternative was to accuse a tenured professor of committing sexual assault and to risk one's athletic scholarship.

189.    Plaintiffs maintained a special relationship with OSU because they were attending on athletic scholarships. Many needed their athletic scholarship to stay in school.  They despised Strauss' medical exams but were willing to endure them if that was a requirement to keep their scholarships.

190.    Plaintiffs maintained a team mentality. No teammate wanted to complain about something he believed his other teammates were having to endure, no matter how unpleasant the experience.

191.    Some Plaintiffs feared being ridiculed and ostracized if they complained to teammates about the sexual undertones they perceived during Strauss' medical examinations and their teammates did not admit to having similar experiences with Strauss.

192.    OSU teams always compete at the highest possible level. Plaintiffs were therefore expected to perform at their best. That required Plaintiffs to make sacrifices and go the extra mile with every aspect of their training and preparation. Plaintiffs were not in a position to judge

whether a reputed world-class sports physician's overly thorough examinations were improper just because things felt wrong or overly invasive. Plaintiffs thought Strauss to be an elite sports doctor, just like they were elite athletes. Plaintiffs also thought that OSU was a reputable and renowned institution that would protect the interests and well-being of their student athletes and act on any reports of inappropriate behavior by their faculty. Strauss' "thoroughness" felt, extreme, embarrassing, and humiliating to the Plaintiffs, but Plaintiffs believed his physicals were a difficult step forward in their quest for excellence and thought that OSU would have stopped the behavior if it was not furthering that quest.

193.     Plaintiffs, as athletes, were expected to be tough and not to complain.

194.     OSU controlled every aspect of how Strauss interacted with the Plaintiffs. OSU provided the facilities, designated Strauss as their doctor, and controlled their scholarships. Plaintiffs had no say in who treated them.

195.     To the extent any Plaintiffs may have complained about this conduct by Strauss, OSU failed to act upon or otherwise dismissed these concerns.

196.     None of the Plaintiffs had/have received medical education or training, so they had/have no knowledge of medical examination techniques for diagnosing or treating hernias, swollen lymph nodes, or hamstring tears, or medical conditions of the penis, testicles, rectum, prostate, or anus.

197.     None of the Plaintiffs have been trained or educated as to what constitutes inappropriate physical conduct in the context of a doctor-patient relationship.

198.     None of the Plaintiffs have ever been educated or trained regarding what comments or questions are inappropriate for a physician to make during a medical examination.

199.     When Strauss sexually assaulted/abused Plaintiffs in a clinical setting, many of them felt confused as to whether abuse had, in fact, occurred.  While Plaintiffs had strong negative emotions and many felt his exams were medically inappropriate, they also understood that feelings are not facts. Many of them did not appreciate until within the two years prior to the filing of their respective original Complaints that Strauss touched them in an unlawful manner.

200.     Plaintiffs were expressly or impliedly misled by OSU trainers, coaches, and employees in the Athletics Department into believing that Strauss' sexually abusive examination methods and statements, though unpleasant and embarrassing, were medically acceptable practices.

201.     Plaintiffs were unlikely to think Strauss was committing an act of sexual violence by manipulating their genitals for extended periods because everyone talked openly about Strauss' over-the-top Strauss' genital exams. To a young college student, how could something discussed so openly actually be a criminal act?  Strauss' insistence upon his rigorous genital and rectal exams became an accepted, albeit despised, part of being treated.  Plaintiffs' only recourse was to make nervous jokes in light of their powerlessness over their predicament. A Plaintiff recalls that during his freshman physical, teammates outside Strauss' closed examination room laughed that it was Plaintiff's "first time" – as though Plaintiff was losing his virginity.

202.     Not until within the two years before filing their respective original Complaints have Plaintiffs had a reasonable basis for believing OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.

203.     Not until within the two years before filing their respective original Complaints have Plaintiffs had a reasonable basis for believing that OSU concealed or remained deliberately

indifferent to the substantial risk that Strauss was sexually abusing them and other male OSU students, particularly student-athletes.

204.     Left to their own means, Plaintiffs had no reasonable way of knowing that OSU had actual knowledge Strauss was sexually abusing male students in a clinical setting.  Plaintiffs also had no way of learning the awful truth about what OSU knew and when, or how OSU chose to permit their continued sexual abuse by Strauss. No exercise of reasonable due diligence would have revealed to them how OSU's acts and omissions caused Plaintiff to suffer independent injuries from the injuries caused by Strauss.

205.     What these students didn't know-at the time Strauss abused them, or at any time until the Report came out-was that rather than respond immediately and appropriately to the first report of Strauss's abuse, OSU as an institution deliberately turned a blind eye to sexual harassment, abuse, and misconduct by Strauss for the next twenty years; it had no policies in place for handling or responding to reports of sexual abuse or harassment, it failed to alert authorities, it failed to discipline, fire, revoke or suspend Strauss's privileges, it failed to report him to the medical board, and it kept Strauss's colleagues and supervisors in the dark about how dangerous Strauss was to the student body.

206.     In fact, the Report concludes that even after OSU officials determined that Strauss's conduct was sexually abusive in nature, they allowed him to quietly retire and bestowed him with emeritus status.

207.     Perkins Coie confirmed that treatments provided for students and student-athletes served no medical purpose or justification and only served to inflict extreme mental trauma on his patients.

208. Like the Plaintiffs in this case, many survivors and loved ones of survivors have described an "awakening" experience upon reading the Report.

209. For the first time, survivors realized that Dr. Strauss's conduct was not medically necessary and they had not only been betrayed by Strauss, but that they were also betrayed by OSU.

210. The Report notably found, applicable to the Plaintiffs here, that "[t]his case presented an intersection of two specific types of sexual abuse, both of which have generally not been associated with common social conceptions of sexual abuse[:]…doctor-patient sexual abuse and the sexual abuse of adult males[,]" and concluding that "[p]atients *often* do not report sexual abuse committed by their doctors due to…*confusion as to whether sexual abuse, in fact, occurred."* Report, at 23 (emphasis added).

211. The Report also found, again applicable to the Plaintiffs here, that it was "***essential***" to "consult with suitably qualified medical experts" "to discern whether, and to what extent, Strauss' physical examinations of student-patients exceeded the boundaries of what was appropriate or medically necessary…" Report, at 24.

212. OSU's own hired law firm found it reasonable for Strauss' patients to be confused as to whether they were receiving legitimate medical care, and in fact had to consult medical experts, yet OSU claims these young people should have known they were not receiving medical care, *as a matter of law.*

OSU'S DELIBERATE INDIFFERENCE TOWARDS STRAUSS' CONDUCT

213. "Beginning as early as Strauss' first year at OSU – and persisting throughout his nearly two decades at the school – students and University staff reported and referred complaints about Strauss to various University employees." (Report at 2).

214.     On information and belief, at all times relevant to this Complaint, persons with the authority to cut-off Strauss' access to patients, to prevent Strauss from sexually abusing patients in a clinical setting, or to implement other corrective measures had, at minimum, actual knowledge there was a substantial likelihood that Strauss was sexually assaulting and abusing male student-athletes and other male OSU students.

215.     As early as 1979, OSU officials with authority to institute corrective measures had information indicating that Strauss posed "a substantial risk of sexual abuse" to male athletes on OSU's intercollegiate sports teams.  Among other things, "[p]ersonnel in the University's Sports medicine program and Athletics Department were aware that Strauss was conducting genital examinations on male athletes that were unusually prolonged, and that Strauss refused to allow athletic training staff to be present for these protracted genital examinations." (Report at 2)

216.     Through administrators, faculty, and staff, OSU had actual notice of Strauss' sexually abusive conduct. OSU, however, dismissed, disregarded, minimized, refuted, denied, silenced, and even concealed complaints about Strauss' sexual misconduct.  At best, OSU chose not to act on information that alerted University faculty, staff, and administrators to a substantial risk that Strauss was sexually abusing Plaintiffs and other male OSU athletes. On information and belief, OSU personnel who were alerted to compelling evidence of Strauss' sexually predatory conduct, but failed to take meaningful action that could have prevented Plaintiffs' injuries, include: Athletic Directors, Assistant Athletic Directors and Associate Athletic Directors; and Head Team Physicians and several team physicians (who were also faculty members).

217.     As early as 1979, personnel in the Athletics Department and in the University's Sports Medicine Program knew that Strauss conducted prolonged genital examinations on male

41

students and refused to allow any OSU personnel to witness the examinations. Such personnel also knew "that Strauss showered alongside the male students at Larkins Hall – a practice unique to Strauss among the other team physicians and a practice that the student-athletes repeatedly complained about to their coaches." (Report at 2)

218.    Additionally, nurses at Student Health Services worried that Strauss was engaging in sexual conduct with patients because he often showed up unannounced to treat patients not on the schedule, took unusually long times examining them, conducted examinations behind closed doors, and failed to fill out medical records documenting the medical services he provided.

219.    Strauss was never disciplined for failing to create or complete medical records, even though such records are standard medical practice and important to providing continuity of care.

220.    By failing to insist that Strauss properly document all patient encounters, OSU made it easy for Strauss to lie about every aspect of what took place during patient visits, or even to deny that he had treated a particular student.

221.    OSU never told Strauss to stop showering with the athletes.

222.    OSU never ordered Strauss to have a third person in the room whenever he was treating a male patient.

223.    OSU did not diligently follow up on any of the rumors or reports regarding Strauss until 1994.

224.    At all relevant times, OSU also did not have a meaningful complaint or dispute resolution process for allegations of faculty sexual harassment or abuse.  On information and belief, OSU's faculty dispute procedure instructed complainants to attempt an informal resolution, i.e., a mediation, with the faculty member at issue before going through other

channels. It made no sense to recommend that victims of sexual abuse and harassment try to

negotiate a resolution with their abusers before seeking formal redress.

225.    At the end of the day, OSU failed the Plaintiffs and Strauss' other victims in every

imaginable way. It effectively gave Strauss a green light to prey upon male OSU students as he

saw fit.  Strauss took full advantage of every opportunity OSU gave him to assault, abuse, and

harass Plaintiffs and other male OSU students.

CONDITIONS AT LARKINS HALL

226.    During the Strauss years, Larkins Hall was in and of itself a constant source of

sexual harassment for the male members of the athletics teams based inside it. Larkins Hall was

home to a number of OSU sports teams, including wrestling, gymnastics, and swimming.  While

Strauss participated in the sexual harassment that took place in Larkins Hall, he did not

independently create the sexually hostile environment that affected the Plaintiffs.

227.    All male university faculty and students were allowed to use the same showers as

the wrestling team.  An aggressively voyeuristic culture developed where certain non-athletes

showered at the same time as wrestlers and soaped their groins vigorously while watching the

wrestlers shower.  These individuals, including Strauss, leered at the wrestlers while watching

them shower. The voyeurs often stayed in the showers until all the wrestlers had finished – often

for an hour or longer.  Some of these individuals were OSU faculty. When the wrestling team

changed its practice time, many of the voyeurs shifted their shower times to coincide with the

wrestling team's new schedule.

228.    Wrestlers were frequently approached in the bathroom and showers and

propositioned for sexual encounters.  One Plaintiff even had notes put in his locker asking him to

meet up for sex.

229.    The harassment was so constant that one wrestler called getting to and from the showers "running the gauntlet."

230.    The wrestling room and spaces around it, including the bathroom and a stairwell, became a popular hangout for sexual encounters. Coach Hellickson found people having sex in a bathroom stall, in a stairwell, in the wrestling room, and in other areas. It was not uncommon for Hellickson to see people engaging in sexual activity inside Larkins Hall.

231.    One of the Plaintiffs, a wrestler, was sexually assaulted by a man who grabbed and tried to fondle him as the wrestler was showering. The resulting physical confrontation worried Hellickson about the possibility things might get violent in the future. Larkins Hall was not a safe space for the male athletes who shared lockers or facilities with non-team members.

232.    Hellickson repeatedly complained to OSU administrators about the environment in Larkins Hall because the conditions seriously impacted the psyche and morale of his wrestlers.

233.    Hellickson requested a separate team shower area. OSU denied his request.

234.    Hellickson begged to have the wrestling team moved to another building. OSU denied his request.

235.    When Hellickson tried to get people to leave because they were ogling the wrestlers and taking hour-long showers, they said it was their right to shower when and for as long as they wanted.  They denied staring at the wrestlers. University police would not make them leave.

236.    Larkins Hall became an unsafe space and sexually hostile environment for wrestlers and some of the other male athletes whose teams were based there.

**CLAIM FOR RELIEF BY ALL PLAINTIFFS**
**COUNT I: Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.*
**Heightened Risk Claim**

237.    Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

238.    Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

239.    Title IX is implemented through the Code of Federal Regulations. See 33 C.F.R. Part 106. 33 C.F.R. § 106.8(b), which provides: ". . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part."

240.    As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment of students is a form of sex discrimination covered by Title IX.

241.    Sexual harassment is unwelcome conduct of a sexual nature, including unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.

242.    Title IX covers all programs of a school that receives any federal financial assistance, and covers sexual harassment—including sexual assault—by school employees, students, and third parties.

243.    At all relevant times, OSU received federal financial assistance and is therefore subject to Title IX.

244.    Title IX required OSU to promptly investigate all allegations of sexual harassment, including sexual assault and abuse.

245.    Strauss committed his unlawful acts while working for OSU as a tenured faculty member, Team Physician, and Sports Medicine Physician.

246.    Strauss' sexual assault, abuse, molestation, and harassment of Plaintiffs—which included, among other things, fondling their testicles, fondling their penises, digitally penetrating their rectums, rubbing his erect penis on their bodies, and making inappropriate sexualized comments—was sex discrimination under Title IX.

247.    OSU was required to promptly investigate and address Plaintiffs' (and other OSU students') allegations, reports and/or complaints of sexually abusive or harassing behavior by Strauss.

248.    OSU had actual knowledge of the serial sexual assault, abuse, and molestation committed by Strauss.

249.    Specifically, OSU knew about Strauss' sexual assault, abuse, and molestation through OSU personnel with authority to take corrective action to address it. Such personnel included but were not limited to: Athletic Directors and Assistant Athletic Directors, and Head Team Physicians and several team physicians (who were also faculty members).

250.    Throughout Strauss' 20-year tenure at OSU, students, student-athletes, and coaches conveyed complaints and concerns to OSU administrators and employees about Strauss' inappropriate sexual conduct.

251.    Given the magnitude of Strauss' abuse—involving students and student- athletes he evaluated and treated over two decades—it would be implausible for OSU to claim that it did not know about Strauss' sexual abuse.

252. Nonetheless, OSU did nothing to address the complaints and concerns about Strauss.

253. OSU's failure to respond promptly and adequately to allegations of Strauss' abuse constitutes sex discrimination, in violation of Title IX.

254. By its acts and omissions, OSU acted with deliberate indifference to the sexual abuse and harassment that Plaintiffs and other male OSU students were experiencing. OSU's deliberate indifference included, without limitation:

    a.  Failing to respond to allegations of Strauss' sexual assault, abuse, and molestation;

    b.  Failing to promptly and adequately investigate allegations of Strauss' sexual assault, abuse, and molestation;

    c.  Requiring male athletes to see Strauss for annual physicals and medical treatment, despite widespread knowledge and complaints about Strauss' abuse;

    d.  Allowing Strauss (and other sexual predators) to roam freely in Larkins Hall;

    e.  Allowing Strauss to work as a physician in Student Health Services, despite widespread knowledge and complaints about Strauss' abuse of male student-athletes;

    f.  Failing to adequately supervise Strauss, after learning that he posed a substantial risk to the safety of male students and student-athletes;

    g.  Failing to require that Strauss properly document all patient encounters;

    h.  Failing to take corrective action to prevent Strauss from sexually assaulting, abusing, and molesting other students; and

      i.   Failing to have in place an effective sexual harassment policy that allowed students to bring complaints without first having to try to resolve complaints of sexual harassment informally with the alleged abuser.

255.   OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss' sexual misconduct caused Plaintiffs (and other male OSU students) to experience further sexual harassment and/or made them vulnerable to it.

256.   OSU's failure to promptly and appropriately investigate, remedy, and respond to complaints about Strauss' sexual misconduct created a sexually hostile environment that effectively denied Plaintiffs access to educational opportunities and benefits at OSU, including appropriate medical care.

257.   As a direct and proximate result of OSU's violation of Plaintiffs' rights under Title IX, Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and have incurred various personal expenses.

**CLAIMS FOR RELIEF BY PLAINTIFFS JOHN DOES 174, 176, 182, 183, AND 195 AND JANE DOE 1**
**COUNT II: Violation of Title IX**
**20 U.S.C. § 1681(a),** *et seq.* **Hostile Environment**

258.   Plaintiffs incorporate by reference the allegations in all previous paragraphs as if fully stated here.

259.   Plaintiffs whose teams were based out of Larkins Hall between 1978 and 1998 (herein, Plaintiffs John Does 174, 176, 182, 183, and 195 and Jane Doe 1) (collectively "Larkins

Plaintiffs") were entitled to use the athletics facilities free from sexual harassment.  However, the pervading and constant sexual harassment they received within Larkins Hall created a hostile environment. The hostile environment these Larkins Plaintiffs suffered in Larkins Hall facilities was so severe, pervasive, and objectively offensive that it effectively barred said Larkins Plaintiffs from access to numerous educational opportunities and benefits, including but not limited to: full use and enjoyment of practice facilities, showers, and locker rooms; and full use and enjoyment of their athletic scholarships and memberships on OSU's sports teams.

260.    The sexually hostile environment inside Larkins Hall during the aforementioned period constituted sex discrimination in violation of Title IX.

261.    Between 1978 and 1998, OSU officials in a position to implement corrective measures had actual knowledge that the Larkins Plaintiffs and other male OSU student-athletes were being subjected to a sexually hostile and abusive environment inside Larkins Hall.

262.    OSU owed the Larkins Plaintiffs a duty to investigate and remedy the conditions that made Larkins Hall a sexually hostile and abusive environment.

263.    Such OSU officials showed deliberate indifference towards the safety of the Larkins Hall Plaintiffs and other male student-athletes who used the Larkins Hall facilities between 1978-1998.

264.    OSU violated Title IX by failing to remedy the sexually hostile and abusive environment in Larkins Hall.

265.    As a direct and proximate result of OSU's violation of the Larkins Plaintiffs' rights under Title IX, the Larkins Plaintiffs have suffered and continue to suffer emotional distress, physical manifestations of emotional distress, mental anguish, fear, depression, anxiety, trauma, disgrace, embarrassment, shame, humiliation, loss of self-esteem, and loss of enjoyment

of life; were prevented and continue to be prevented from obtaining the full enjoyment of life; have sustained and continued to sustain loss of earnings and earning capacity; and incurred various personal expenses.

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)     Enter judgment in favor of Plaintiffs on their claim for discrimination under Count I Title IX against Defendant The Ohio State University;

(b)     Enter judgment in favor of the Plaintiffs on their claim for discrimination under Count II Title IX against Defendant The Ohio State University;

(c)     Declare Defendant The Ohio State University's conduct in violation of Title IX of the Education Amendments of 1972;

(e)     Award Plaintiffs compensatory damages in amounts to be established at trial, including, without limitation, payment of Plaintiffs' medical and other expenses incurred as a consequence of the sexual abuse and/or harassment and The Ohio State University's deliberate indifference; damages for deprivation of equal access to the educational opportunities and benefits provided by The Ohio State University; and damages for past, present and future emotional pain and suffering, ongoing mental anguish, loss of past, present and future enjoyment of life, and loss of future earnings and earning capacity;

(f)     Award Plaintiffs pre-judgment and post-judgment interest;

(g)     Award Plaintiffs their court costs and expenses, including attorney's fees, pursuant to 41 U.S.C. § 1988(b); and

(h)  Grant such other relief as this Court deems just and proper.

Respectfully submitted,


*/s/ Richard W. Schulte*
**Richard W. Schulte (0066031)**
**WRIGHT & SCHULTE, LLC**
865 S. Dixie Dr.
Vandalia, OH 45377
(937) 435-7500
(937) 435-7511 facsimile
rschulte@yourlegalhelp.com

*Counsel for Plaintiffs*


*/s/ Michael L. Wright*
**Michael L. Wright (0067698)**
**WRIGHT & SCHULTE, LLC**
130 W. 2nd Street, Suite 1600
Dayton, OH 45402
(937) 222-7477
(937) 222-7911 facsimile
mwright@yourohiolegalhelp.com

*/s/ Dennis P. Mulvihill*
**Dennis P. Mulvihill (0063896)**
**WRIGHT & SCHULTE, LLC**
23139 Chagrin Blvd., Suite 620
Cleveland, OH 44022
(216) 591-0132
(216) 591-0622 facsimile
dmulvihill@yourlegalhelp.com

*Counsel for Plaintiffs*