# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JOHN DOE 162,**

      **Plaintiff,**

    **v.**

**THE OHIO STATE UNIVERSITY,**

      **Defendant.**

**Case No. 2:23-cv-2991**
**Judge Michael H. Watson**
**Magistrate Judge Deavers**

---

**STEVE SNYDER-HILL,** *et al.*,

      **Plaintiffs,**

    **v.**

**THE OHIO STATE UNIVERSITY,**

      **Defendant.**

**Case No. 2:23-cv-2993**
**Judge Michael H. Watson**
**Magistrate Judge Deavers**

---

**WILLIAM KNIGHT,** *et al.*,

      **Plaintiffs,**

    **v.**

**THE OHIO STATE UNIVERSITY,**

      **Defendant.**

**Case No. 2:23-cv-2994**
**Judge Michael H. Watson**
**Magistrate Judge Deavers**

---

**JOHN DOE,**

      **Plaintiff,**

    **v.**

**THE OHIO STATE UNIVERSITY,**

      **Defendant.**

**Case No. 2:23-cv-2996**
**Judge Michael H. Watson**
**Magistrate Judge Deavers**

---

**EDWARD GONZALES,** *et al.,*

     **Plaintiff,**

    v.

**THE OHIO STATE UNIVERSITY,**

     **Defendant.**

**Case No. 2:23-cv-3051**
**Judge Michael H. Watson**
**Magistrate Judge Deavers**

## OPINION AND ORDER

The Court considers now whether emotional-distress damages are available in this private suit under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681.

On the surface, emotional-distress damages seem straightforwardly foreclosed by *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022). There, the United States Supreme Court held that emotional-distress damages are not recoverable in a private action to enforce Title VI of the Civil Rights Act of 1964 ("Title VI").[1] *Id.* at 230. The logic was simple: Title VI is a "Spending Clause statute"[2]; Spending Clause statutes permit an implied private remedy only if the remedy is "traditionally available" in breach-of-contract suits; and emotional-distress damages are traditionally unavailable in breach-of-contract suits. *Id.* at

---

[1] The petitioner in *Cummings* did not sue under Title VI; she sued under the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116. 596 U.S. at 218. Even so, the holding of *Cummings* extends to Title VI because those two antidiscrimination statutes "each expressly incorporates the rights and remedies provided under Title VI." *Id.* (citing 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 18116(a)).

[2] This Court uses the term "Spending Clause statute" to refer to statutes that impose conditions on federal spending pursuant, at least in part, to Congress's spending power.

218–30. Title IX is also a Spending Clause statute, and courts interpret it consistently with Title VI. *See Barnes v. Gorman*, 536 U.S. 181, 185–86 (2002) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694–98 (1979); *Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 640 (1999)). So it would seem that "*Cummings* leaves little doubt that emotional distress damages are no longer permitted for violations of Title IX[,]" like those that Plaintiffs allege here. *S.C. v. Metro Gov't of Nashville*, 86 F.4th 707, 718 (6th Cir. 2023) (citation omitted).

Digging deeper reveals an issue of first impression. As the term "Spending Clause statute" suggests, *Cummings*'s rationale might have relied on the constitutional source of Congress's power to enact Title VI. 596 U.S. at 220, 222, 226. But what if there were another constitutional source for Title IX? Section 5 of the Fourteenth Amendment, perhaps? As Plaintiffs point out, "Congress had the authority, pursuant to Section 5, to make Title IX applicable to the states." *Franks v. Kentucky Sch. for the Deaf*, 142 F.3d 360, 363 (6th Cir. 1998) (citations omitted). And Section 5 empowers Congress to provide for emotional-distress damages. *See Gibson v. State of Mississippi*, 162 U.S. 565, 580 (1896) (upholding § 1981 as validly enacted under the Fourteenth Amendment); 42 U.S.C. § 1981a(b)(3) (providing for emotional-distress damages). Thus, Plaintiffs contend, Congress could have provided for emotional-distress damages in Title IX, notwithstanding *Cummings* and its supposedly Spending-Clause-based rationale.

This tees up the question: Does the contract-law analogy limit Title IX's private remedies even if it validly enforces the Fourteenth Amendment?  The Supreme Court has yet to answer this question.  And some case law suggests that the answer may be no.  *Cf. Nevada Dept. of Hum. Resources v. Hibbs*, 538 U.S. 721, 726–27, 735 (2003).

But this Court suspects that the answer is yes based on *Cummings* and the other Spending Clause cases.[3]  In many of the Spending Clause cases, the Supreme Court applied the contract-law analogy (and the traditional-availability test) despite having heard Fourteenth-Amendment-based arguments before.  Why?  This Court is unsure, but it can imagine a principled reason: the contract-law analogy might limit Title IX, even if it enforces the Fourteenth Amendment, because it has a contract-like statutory structure.  That is, Title IX operates by "conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds."  *Gebser*, 524 U.S. at 286.  This structural feature may justify applying the contract-law analogy and traditional-availability test to limit Title IX, irrespective of the source of Congress's power to enact it.  For these reasons, expanded on below, the Court holds that emotional-distress damages are unavailable in this private Title IX action.

---

[3] *See, e.g., Arlington Central Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291 (2006); *Barnes*, 536 U.S. 181; *Davis*, 526 U.S. 629; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998); *Franklin v. Gwinnett Cnty. Pub. Schools*, 503 U.S. 60 (1992); *Pennhurst State Sch. and Hospital v. Halderman*, 451 U.S. 1 (1981).

# I.     BACKGROUND

## A.     Factual Background

Defendant The Ohio State University ("OSU") formerly employed Dr. Richard Strauss as an athletic-team doctor.  While working for OSU over many decades, Strauss sexually abused countless student-athletes.  Many complained of Strauss's abuse over the years, yet OSU turned a blind eye.  So, a group of Strauss's victims ("Plaintiffs")—mostly former OSU students— sued OSU under Title IX.

## B.     Procedural Background

Parallel with discovery, the parties[4] seek a ruling on whether emotional-distress damages are available.  At the Court's request, the parties have briefed the issue.  ECF Nos. 75, 79, 82.[5]

## C.     Legal Background

Title IX prohibits gender discrimination in education:

> "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

20 U.S.C. § 1681(a).

---

[4] Plaintiffs in *Snyder-Hill v. The Ohio State Univ.*, Case No. 2:23-cv-2993, do not join the other Plaintiffs' opening brief because they are not seeking emotional-distress damages.  ECF No. 82 at PAGEID # 1243.  The *Snyder-Hill* plaintiffs do, however, join one portion of the other Plaintiffs' reply brief.  *Id.*  The Court refers to those seeking emotional-distress damages as "Plaintiffs" for ease of reference.

[5] Unless noted otherwise, citations are to the docket in *Gonzales v. The Ohio State Univ.*, Case No. 2:23-cv-3051.

Title IX operates like a contract between the Government and educational institutions that receive federal funding. *Gebser*, 524 U.S. at 286. Title IX authorizes federal agencies to "offer" education funding but instructs them to attach "terms" that implement Title IX's nondiscrimination mandate. 20 U.S.C. § 1682. Of course, those requirements do not apply to education programs that decline federal funding. *Cf. Pennhurst*, 451 U.S. at 11 ("States are given the choice of complying with the conditions . . . or forgoing the benefits of federal funding."). But if an educational institution "accepts" federal funds and "breaches" by discriminating based on sex, then Title IX authorizes agencies to enforce its antidiscrimination terms by terminating the "contract" (ceasing federal funds) or any other means authorized by law. 20 U.S.C. § 1682.

Although Title IX's only express enforcement mechanism is administrative, private individuals may sue to enforce it. *Cannon*, 441 U.S. at 703. That much is "beyond dispute." *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

It is less clear, however, what private remedies Title IX makes available. *See Barnes*, 536 U.S. at 185. Confronting the issue in *Franklin*, the Supreme Court held that monetary damages are available in private Title IX suits. 503 U.S. at 76. For the violation of a federal right (like the one Title IX enshrines), *Franklin* declared, "a federal court may order *any appropriate relief*." *Id.* at 69 (emphasis added). Later cases clarify what relief is appropriate.

The Supreme Court addressed which categories of monetary relief are "appropriate" first in *Barnes*. That case presented the question: Does Title VI permit private plaintiffs to collect punitive damages?[6] *Barnes*, 536 U.S. at 183. The Supreme Court answered no; punitive damages cannot be awarded in private Title VI suits. *Id.* at 189–90. The Supreme Court reasoned that Spending Clause statutes, including Title VI, are "'much in the nature of a *contract*: in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Id.* at 186 (quoting *Pennhurst*, 451 U.S. at 17) (emphasis and alterations in original). This contract-law analogy, the Supreme Court continued, "'has implications for our construction of the scope of available remedies.'" *Id.* at 187 (quoting *Gebser*, 524 U.S. at 287). One implication, drawing from principles of mutual assent, is that a Spending Clause statute permits a remedy "only if the funding recipient is *on notice* that, by accepting federal funding, it exposes itself to that remedy." *Id.* (emphasis in original). Generally, recipients are "on notice" of only express statutory remedies plus those "'traditionally available in suits for breach of contract.'" *Id.* The Supreme Court found that punitive damages were neither expressly permitted by Title VI nor traditionally available in breach-of-

---

[6] As with the petitioner in *Cummings*, the respondent in *Barnes* did not sue under Title VI; he sued under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132, and the Rehabilitation Act. *Barnes*, 536 U.S. at 185. Yet, as in *Cummings*, the holding in *Barnes* naturally extends to Title VI because the remedies available under those two statutes are "coextensive" with the remedies available under Title VI. *Id.*

contract suits. *Id.* at 187–88.[7] Hence, punitive damages cannot be awarded in private Title VI suits.

The latest clarification on the "appropriate" categories of monetary relief came in *Cummings*. To reiterate, the Supreme Court held there that emotional-distress damages are unavailable in private Title VI actions. *Cummings*, 596 U.S. at 230. The Supreme Court reached that holding by again applying the contract-law analogy. *Id.* at 219–20.[8] Just like in *Barnes*, the contract-law analogy led the *Cummings* Court to ask whether emotional-distress damages are a "usual" contract remedy. *Id.* at 221 (Roberts, J.). Surveying many contract-law authorities, the Supreme Court found that emotional-distress damages are, at best, an unusual contract remedy. *Id.* at 221–30.[9] So, *Cummings* concludes, emotional distress is not compensable in a private Title VI action. *Id.* at 230.

---

[7] On traditional availability, *Barnes* cites: 3 E. Farnsworth, Contracts § 12.8, pp. 192–201 (2d ed. 1998); Restatement (Second) of Contracts § 355; and 1 T. Sedgwick, Measure of Damages § 370 (8th ed. 1891).

[8] Rather than apply the contract-law analogy, two Justices in the *Cummings* majority would have "reorient[ed] the inquiry to focus on a background interpretive principle rooted in the Constitution's separation of powers." *See id.* at 230. (Kavanaugh, J., concurring). In their view, "that background interpretive principle—more than contract-law analysis—counsels against judicially authorizing compensatory damages for emotional distress in suits under the implied Title VI cause of action." *Id.* at 230–31.

[9] On traditional availability, *Cummings* cites: D. Laycock & R. Hasen, Modern American Remedies 216 (5th ed. 2019); 11 W. Jaeger, Williston on Contracts § 1341, p. 214 (3d ed. 1968); E. Farnsworth, Contracts § 12.17, p. 894 (1982); J. Perillo, Calamari & Perillo on Contracts § 14.5, p. 495 (6th ed. 2009); C. McCormick, Law of Damages § 145, p. 592 (1935).

## II.    ANALYSIS

A.    **The contract-law analogy applies to Title IX, irrespective of the constitutional powers Congress could have used to enact it.**

1.    **Despite having been presented with arguments based on the Fourteenth Amendment, the Supreme Court has repeatedly applied the contract-law analogy to Titles VI and IX.**

Like Title VI, Title IX is a Spending Clause statute. *Davis*, 526 U.S. 640.

In line with their shared Spending Clause pedigree, courts interpret Title IX and

Title VI remedies identically. *See, e.g.*, *Cannon*, 441 U.S. at 694–98, 703 ("We

have no doubt that Congress intended to create Title IX remedies comparable to

those available under Title VI"). And the remedy question here (Are emotional-

distress damages available in Title IX suits?) is identical to the remedy question

in *Cummings* (Are emotional-distress damages available in Title VI suits?).

Treating identical questions identically would thus require this Court to apply the

contract-law analogy to Title IX and ask a question *Cummings* already answered

in the negative: are emotional-distress damages "traditionally available" in

breach-of-contract suits? 596 U.S. at 221–30.

But Title IX is not *just* a Spending Clause statute, Plaintiffs interject. *See*

Br. 6–8, ECF No. 75. It is also Fourteenth-Amendment-enforcement legislation.

*Franks*, 142 F.3d at 363; *see also Doe v. Univ. of Kentucky*, 111 F.4th 705, 724

(6th Cir. 2024) (citing *Franks* approvingly); *see generally* Emily J. Martin, *Title IX

and the New Spending Clause*, AM. CONST. SOC., 12–16 (Dec. 2012).

Congress can indeed legislate using multiple constitutional powers, and, when it does, the limits on one power do not constrain the others. *See, e.g.,* *Hibbs*, 538 U.S. at 726–27. The Family and Medical Leave Act ("FMLA") illustrates this multiple-power-source dynamic. 29 U.S.C. § 2612(a)(1)(C). Congress's power to enact the FMLA flows from two sources: the Commerce Clause and Section 5 of the Fourteenth Amendment. *Hibbs*, 538 U.S. at 726–27. Congress cannot abrogate States' sovereign immunity with its commerce power, but it can with its Fourteenth-Amendment-enforcement power. *Id.* (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); and *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976)). Despite the commerce power's limits, the FMLA abrogates state immunity, the Supreme Court held, because it enforces the Fourteenth Amendment. *See generally id.*

This multiple-power-source logic may appear to apply to Title IX as well. As discussed above, like the FMLA, Congress's power to enact Title IX may flow from two sources: the Spending Clause and Section 5 of the Fourteenth Amendment. *Franks*, 142 F.3d at 363. Even if Congress cannot provide for implied emotional-distress damages with its spending power, maybe it can with its Fourteenth-Amendment-enforcement power. So, despite the spending power's limits, Title IX can provide for private emotional-distress damages, Plaintiffs contend, because Title IX enforces the Fourteenth Amendment.

Though it may seem sound, the multiple-power-source argument is not new. The Supreme Court has heard an argument along similar lines, before

*Cummings*, on at least three occasions. *Pennhurst*, 451 U.S. at 15–16; *Franklin*,

503 U.S. at 75 n.8; *Murphy*, 548 U.S. at 305 (Ginsburg, J., concurring).

First, the Supreme Court heard a multiple-power-source argument in

*Pennhurst*. That case tackled whether a certain spending statute (the

Developmentally Disabled Assistance and Bill of Rights Act) permits private

enforcement actions. The Supreme Court recognized that if Section 5 of the

Fourteenth Amendment were the "source of Congress's power to legislate," then

that power could affect the Court's construction. *Id.* at 15. But, the Supreme

Court noted, "[it] should not quickly attribute to Congress an unstated intent to act

under its authority to enforce the Fourteenth Amendment." *Id.* at 16. And "the

Act's language and structure demonstrate that it is a mere federal-state funding

statute." *Id.* at 18. Thus, the Supreme Court concluded that the Spending

Clause (and not the Fourteenth Amendment) was the source of Congress's

power. *Id.* In the end, *Pennhurst* never explains how the Fourteenth-

Amendment-enforcement power would affect a spending statute's construction.

Next, in *Franklin*, the Supreme Court confronted the same multiple-power-

source argument. As mentioned above, *Franklin* asks whether Title IX's implied

private right of action supports monetary damages. To argue that it does, the

petitioner invoked the Fourteenth Amendment. 503 U.S. at 75 n.8 ("Franklin

argues that, in any event, Title IX should not be viewed solely as having been

enacted under Congress' Spending Clause powers and that it also rests on

powers derived from § 5 of the Fourteenth Amendment"). Even so, the Supreme

Court declined to address the effect of the Fourteenth-Amendment-enforcement power on the scope of private remedies available under Title IX. The Supreme Court avoided the issue by concluding that Title IX made money damages available "irrespective of the constitutional source of Congress' power to enact the statute[.]" *Id.* Because the Supreme Court decided both *Pennhurst* and *Franklin* before *Barnes*, this Court imagines that the Supreme Court was aware of Plaintiffs' multiple-power-source argument when it decided *Barnes*.

After *Barnes*, the Supreme Court faced this same multiple-power-source argument a third time in *Murphy*—this time from a Justice. *Murphy* involved the Individuals with Disabilities Education Act ("IDEA"), another statute that attaches conditions to federal funding. 20 U.S.C. § 1400 *et seq*. The issue in *Murphy* was whether the IDEA permits prevailing private parties to recover expert costs. 548 U.S. at 293–94. The Supreme Court held that it does not. *Id.* Tracking *Barnes* and *Cummings*, the majority opinion reasoned: the IDEA is a Spending Clause statute; Spending Clause statutes permit only remedies of which recipients have "clear notice"; and the IDEA does not provide "clear notice" of expert-cost shifting. *See id.* at 295–96, 300. Concurring, Justice Ruth Bader Ginsburg made essentially the same multiple-power-source argument that Plaintiffs make here:

> The Court's repeated references to a Spending Clause derived "clear notice" requirement . . . are questionable[.] For one thing, IDEA was enacted not only pursuant to Congress' Spending Clause authority, but also pursuant to § 5 of the Fourteenth Amendment.

548 U.S. at 305. The majority opinion does not address this aspect of Justice Ginsburg's concurrence but, all the same, limits the IDEA's remedies according to the contract-law analogy. *Id.* at 295–96 (Alito, J.). To recap, *Murphy* marks the third time that the Supreme Court mentioned the multiple-power-source argument without analyzing it. If the Supreme Court were not already aware of the multiple-power-source argument by *Barnes*, this Court expects that Justice Ginsburg's *Murphy* concurrence made it aware before *Cummings*.

Yet the multiple-power-source argument has never deterred the Supreme Court from applying the contract-law analogy to Title IX (or other conditional-funding statutes). *Gebser*, 524 U.S. at 287; *Davis*, 526 U.S. at 640; *cf. Murphy*, 548 U.S. at 295–96 (the IDEA). Nor has it ever deterred the Supreme Court from limiting Title VI's implied private remedies to those "traditionally available" in breach-of-contract suits. *Barnes*, 536 U.S. at 187; *Cummings*, 596 U.S. at 220–21. The Supreme Court has thus signaled[10] that the contract-law analogy and its corollary traditional-availability test limit Title IX no matter which constitutional powers sustain it, though the Supreme Court has never explained why.

---

[10] To be clear, the Court does not mean to suggest that the Supreme Court tacitly held anything—especially not, as OSU argues, that the Fourteenth Amendment could not support Title IX. This Court doubts that the Supreme Court would tacitly adopt a proposition of constitutional law—much less one this significant. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring); *cf. Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

Even without this why, the Spending Clause cases warrant *stare decisis*. *Gebser* and *Davis* instruct this Court to apply the contract-law analogy to Title IX. 524 U.S. at 287; 526 U.S. at 640. Building on that, *Barnes* instructs this Court that the contract-law analogy entails limiting implied private remedies to those "traditionally available" in breach-of-contract suits. 536 U.S. at 187. And building even higher, *Cummings* instructs that emotional-distress damages are usually not available for contract breach. 596 U.S. at 230. Ultimately, the Court must follow these instructions, notwithstanding an (ostensibly) incomplete rationale.[11]

2. **The contract-law analogy could stem from Title IX's contract-like statutory structure—rather than from limits to Congress's spending power—averting any doctrinal tension.**

Hoping to quell any concern about doctrinal inconsistency, the Court returns to the question: why wouldn't the source of Congress's power matter? The Court can envision a principled reason why the source of Congress's power might[12] not matter. The contract-law analogy might limit Title IX, whatever the source of Congress's power to enact it, because it has a contract-like statutory structure.

---

[11] Nor can the Court entertain criticisms of the contract-law analogy as generally imprudent or incoherent. *See, e.g.*, *Cummings*, 596 U.S. at 230–31 (Kavanaugh, J, concurring); *cf.* Benjamin Eidelson & Matthew C. Stephenson, *The Incompatibility of Substantive Canons and Textualism*, 137 HARV. L. REV. 515, 558–77 (2023) (generally criticizing substantive canons—like *Pennhurst* and the contract-law analogy).

[12] This Court hesitates to suggest anything about the actual reason the Supreme Court applies the contract-law analogy despite the multiple-power-source argument. That said, as discussed below, grounding the contract-law analogy in statutory structure is consistent with the Spending Clause cases.

Intuitively at least, Title IX's contract-like structure could, by itself, support the contract-law analogy. Granted, the contract-law analogy advances substantive constitutional norms related to federalism. *Cf. Natl. Fedn. of Indep. Bus. v. Sebelius,* 567 U.S. 519, 576–77 (2012) (describing the contract-law analogy as "critical to ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system"). But the contract-law analogy may also capture ordinary interpretive intuitions about contract-like statutes. And that alone could prop the analogy, leaving federalism as an ancillary justification. *See generally* Brian Slocum & Kevin Tobia*, The Linguistic* and *Substantive Canons*, 137 HARV L. REV. 70 (2023). Put differently, the contract-law analogy may be both a linguistic canon (like the rule against surplusage) and a substantive canon (like the rule of lenity). *See generally id.*; *see also* Abbe R. Gluck, *The Federal Common Law of Statutory Interpretation: Erie for the Age of Statutes*, 54 WM. & MARY L. REV. 753, 768 (2013) ("*Pennhurst* is simultaneously a canon of interpretation—it tells courts how to interpret unclear statutes—and a direct constitutional rule; spending conditions in violation of it will be struck down."). The contract-law analogy may thus stand as a linguistic canon of statutory construction that applies to contract-like statutes including Title IX.

What's more, the contract-law analogy might apply to contract-like statutes, independent of the Spending Clause. That is, the spending power might drive neither the contract-law analogy nor contract-like statutory

structure—at least not necessarily. Rather, the contract-law analogy and contract-like structure each come apart from the spending power.

Starting with the contract-law analogy, it does not apply to all statutes enacted under the Spending Clause. *See Sossamon v. Texas*, 563 U.S. 277, 289–90 (2011); *cf. Bennett v. Kentucky Dept. of Ed.*, 470 U.S. 656, 669 (1985) ("[Title I] cannot be viewed in the same manner as a bilateral contract governing a discrete transaction"). In *Sossamon*, the Supreme Court confronted the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). 42 U.S.C. § 2000cc *et seq.* The Supreme Court considered whether the RLUIPA permits private suits for money damages. *Sossamon*, 563 U.S. at 280. Because Congress enacted it under the Spending Clause, the petitioner argued, the RLUIPA should be interpreted according to the contract-law analogy. *Id.* at 289. The Supreme Court rejected that argument. *Id.* at 290 ("In any event, applying ordinary contract principles here would make little sense[.]"). That rejection suggests that something else—something besides the spending power—drives whether the contract-law analogy applies to a given statute. As the Court theorizes above, that something else may be contract-like statutory structure.

Nor do all Spending Clause statutes have contract-like statutory structure. Take the federal prohibition on state, local, and tribal bribery for example. 18 U.S.C. § 666. Congress validly enacted Section 666 with its Spending Clause power. *Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures and on the reliability of those who use public

money is bound up with congressional authority to spend in the first place"). Yet, unlike Title IX, Section 666 lacks a contract-like structure. *United States v. Sabri*, 326 F.3d 937, 946 (8th Cir. 2003) ("[18 U.S.C.] § 666 has no contractual 'terms' with which the recipient of federal funds must comply."). Thus, Title IX's contract-like structure exists independent from the spending power.

Understanding the contract-law analogy as grounded in contract-like structure is also consistent with the Spending Clause cases. They often comment on Title IX's contract-like statutory structure. *Gebser*, 524 U.S. at 286 ("[Title IX] operates [by] conditioning an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient"); *id.* ("That contractual framework distinguishes Title IX from Title VII"); *id.* at 287 ("Title IX's contractual nature has implications for our construction of the scope of available remedies."); *cf. Barnes*, 536 U.S. at 186 ("[Title VI is] 'much in the nature of a contract: in return for federal funds, [recipients] agree to comply with federally imposed conditions.'" (quoting *Pennhurst*, 451 U.S. at 17)). More generally, the Spending Clause cases describe themselves as performing statutory interpretation:

- In *Cummings*, the prevailing party's advocate and two Justices in the majority made clear that the case was about statutory interpretation. In a statement that no Justice challenged, the prevailing party's advocate said, "of course, [the question presented here] is a question of statutory interpretation." Or. Arg. Tr. at 71:5–6. Two Justices in the *Cummings* majority also wrote separately to comment on the majority's method of interpretation. *Cummings*, 596 U.S. at 230–31 (Kavanaugh, J., concurring); *see also* Or. Arg. Tr. at 10:22–11:19 (asking about an alternative

interpretative method). The contract-law analogy, according to them, is an "interpretive principle." *Cummings*, 596 U.S. at 230 (Kavanaugh, J, concurring).

- In *Barnes*, the Supreme Court distinguished the contract-law analogy from an "interpretive technique" that could find an implied punitive damages provision in Title VI. 536 U.S. at 187–88.

- In *Davis*, the Supreme Court said it was "interpreting language in spending legislation[.]" 526 U.S. at 640.

- In *Gebser*, the Supreme Court was perhaps the most explicit about its statutory interpretation. 524 U.S. at 284 ("Because the private right of action under Title IX is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute. . . . To guide the analysis, we generally examine the relevant statute to ensure that we do not fashion the scope of an implied right in a manner at odds with the statutory structure and purpose." (internal citations omitted)); *id.* at 286 ("Title IX's contractual nature has implications for our *construction* of the scope of available remedies." (emphasis added)). *Cummings* cites these portions of *Gebser*. 596 U.S. at 219. As does *Barnes*. 536 U.S. at 187, 188 n.2.

- *Franklin* also describes itself as conducting "statutory analysis." 503 U.S. at 72; *see also id.* at 71 (asking "whether Congress intended to limit application of this general principle in the enforcement of Title IX"). The *Gebser* dissent likewise described *Franklin*'s holding (Title IX authorized damages in private suits) as a "construction." 524 U.S. at 296 (Stevens, J., dissenting).

- *Pennhurst* frames the question before the Court as "one of statutory construction." 451 U.S. at 15. In fact, *Pennhurst's* construction avoided the same essential Fourteenth Amendment argument that Plaintiffs press here. *Id.* at 18 ("There is virtually no support for the . . . conclusion that Congress [used] its power to enforce the Fourteenth Amendment. . . . Quite the contrary, the Act's language and structure demonstrate that it is a mere federal-state funding statute.").

All in all, taking the Spending Clause cases at their word, they could rest purely on structure-based statutory interpretation.

In sum, even if the Spending Clause cases seem to form a doctrinal knot, pulling the string of statutory interpretation easily unties it. Separable from the spending power's limits, Title IX's contract-like statutory structure may alone justify interpreting it according to the contract-law analogy. Cases like *Hibbs* therefore present no serious impediment to following *Barnes* and *Cummings*. Following them, the Court applies the traditional availability test below.

**B.  Because the contract-law analogy and traditional-availability test apply to Title IX, *Cummings* precludes emotional-distress damages.**

Again, *Cummings* held that "[t]here is . . . no basis in contract law to maintain that emotional distress damages are 'traditionally available in suits for breach of contract[.]'" 596 U.S. at 230. The traditional-availability test thus "straightforwardly" forecloses emotional-distress damages for private Title IX suits. *Id.* at 221–22.

This Court is hardly the only one that thinks so.[13] Even the *Cummings* dissenters seemed to think so. *Cummings*, 596 U.S. at 232–33 (Breyer, J.,

---

[13] *See, e.g., S.C.*, 86 F.4th at 718 ("Although Title IX was not specifically at issue in *Cummings*, the decision referred to Title IX as part and parcel of the other Spending Clause statutes with implied private rights of action for which emotional distress damages are not available. *Cummings* leaves little doubt that emotional distress damages are no longer permitted for violations of Title IX." (citations omitted)); *Doe v. Loyola Univ. Chicago*, 100 F.4th 910, 912 (7th Cir. 2024) ("As for damages . . . punitive damages are unavailable in private litigation under laws based on the Spending Clause. Title IX is such a law . . . [*Cummings*] adds that damages for emotional distress also are unavailable under Spending-Clause statutes." (citations omitted)); *B.R. v. F.C.S.B.*, 718 F. Supp. 3d 504, 510–11 (E.D. Va. 2024) ("B.R.'s argument is certainly creative, but this Court declines to depart from the language of *Cummings* itself, which categorized Title IX as a Spending Clause authority statute to which *Cummings* would apply, or from every other court to have analyzed the issue. Accordingly, this Court holds that *Cummings* applies to Title IX cases.").

dissenting) ("[T]he Court's decision today will affect the remedies available under all four of these statutes, impacting victims of race, sex, disability, and age discrimination alike."). By contrast, the Court has found no case refusing to apply *Cummings* and its traditional-availability analysis to Title IX.

Still, Plaintiffs resist *Cummings* with three ill-fated arguments. Br. 8–14, ECF No. 75. First, Plaintiffs contend that, unlike the small rehabilitation facility in *Cummings*, schools have been on notice that emotional-distress damages are available against them in Title IX cases. Second, eliminating emotional-distress damages, Plaintiffs assert, will gut enforcement efforts and harm the victims that Title IX was enacted to protect. Third, Plaintiffs maintain that the equitable maxim "where there's a right, there's a remedy" justifies a discretionary award for emotional distress.

Yet *Cummings* confronted and rejected arguments along these same lines. The *Cummings* dissenters made Plaintiffs' first two arguments. *Cummings*, 596 U.S. at 236 (Breyer, J., dissenting) ("It is difficult to believe that prospective funding recipients would be unaware that intentional discrimination based on race, sex, age, or disability is particularly likely to cause emotional suffering."); *id.* at 235 ("The statutes before us seek to eradicate invidious discrimination. That purpose is clearly nonpecuniary."). And Amici Curiae presented Plaintiffs' third argument. *See generally* Brief for Law Professors as Amici Curiae in Support of Petitioner, *Cummings*, 596 U.S. 212 (2022). Seeing as *Cummings* rejected these arguments, this Court does too.

In sum, *Cummings* effectively controls the outcome here.

### III. CONCLUSION

The Court holds that Plaintiffs cannot recover emotional-distress damages. Vindicating "human dignity and not mere economics" nevertheless remains a core purpose of antidiscrimination law. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 291 (1964) (Goldberg, J., concurring); *see also Franklin*, 503 U.S. at 63–65, 76; U.S. Dep't of Educ., Office for Civil Rights, *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12034, 12041 (1997). That is no doubt why some antidiscrimination statutes (expressly) permit recovery for emotional distress. Although it too prohibits discrimination, under binding Supreme Court interpretive precedent, Title IX does not (impliedly) permit the same.

To be clear, the Court's holding here does not affect what other categories of compensatory damages Title IX makes available (*e.g.*, those that OSU calls "speculative, indeterminate, or unforeseeable"). Nor does it affect whether certain damages fall within the emotional-distress category (*e.g.*, those that OSU argues "resemble" emotional-distress damages). The Court holds only that private Title IX damages are limited to those "traditionally available" in breach-of-contract suits, and therefore, emotional distress is not compensable as such.

**IT IS SO ORDERED.**

MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT

Case Nos. 2:23-cv-2991; 2:23-cv-2993;
2:23-cv-2994; 2:23-cv-2996; 2:23-cv-3051